IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KARI L. STARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 1:06cv455-WC |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

The plaintiff herein, Kari L. Starr, filed an application for SSDI and SSI

benefits pursuant to 42 U.S.C. §§ 401, *et seq.,* alleging disability as of January 12,

2004.  Plaintiff's applications were denied on July 19, 2004.  A hearing was held on

September 23, 2005, and the Administrative Law Judge (ALJ) also denied the claim.

The Appeals Council rejected a subsequent request for review.  The ALJ's decision

became the final decision of the Commissioner of Social Security (Commissioner).[1]

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

*See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  Pursuant to 28 U.S.C. § 636(c), both parties have consented to the conduct of all proceedings and entry of a final judgment by the United States Magistrate Judge (Docs. #17-18, filed January 22, 2007).   Based on its review of the record and the briefs of the parties, this court concludes that the decision of the Commissioner is due reversed and remanded for further finding consistent with this decision.

## II. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited to a determination of whether factual findings of the ALJ were supported by substantial evidence and whether the proper legal standards were applied.  *Foote v.Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995);  *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999).  Substantial evidence is more than a scintilla but less than a preponderance; it is that which a reasonable person would accept as adequate to support the conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Appellate scrutiny encompasses a review of the record as a whole, including all the evidence in favor and all the evidence against the

ALJ's conclusions.  *Chester,* 792 F.2d at 131.  Review takes into consideration evidence that may detract from that relied upon by the ALJ.  *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  However, the court may not re-weigh the evidence or substitute it's judgment for that of the fact finder's.  *Foote,* 67 F.3d at 1560.  As to the application of legal principles, review is plenary; the ALJ's legal conclusions are review *de novo*.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).  If an improper legal standard has been applied, or factual findings are not supported by substantial evidence, this court may reverse the Commissioner's final decision.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).

As to application of established law at the hearing level, it is incumbent upon the ALJ to employ a five-step evaluation process when determining whether a plaintiff is disabled.  20 C.F.R. § 404.1520.   At the first three steps, it must be evaluated:  (1) whether plaintiff is currently performing substantial gainful activity, (2) whether plaintiff has a severe impairment, and (3) whether that severe impairment meets or exceeds a listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulation No. 4.  If the plaintiff's impairment(s) meets or medically equals the criteria of a listed impairment, and meets the durational requirements, the plaintiff is disabled.  If plaintiff's impairment(s) does not meet the criteria of a listing, it can medically equal the criteria of a listing if the impairment(s) or combination of

impairments are medically significance enough to equal those of a listed impairment. 20 C.F.R. §§ 404.1525(b)(5); 20 C.F.R. §§ 404.1526(b)(3).   If the plaintiff is not found disabled at this point, the ALJ must continue through to step five.

Before considering step four or five, the ALJ must determine the plaintiff's residual functional capacity [RFC] .  An individual's RFC is the plaintiff's ability to do physical or mental work activities on a sustained basis despite limitations from his or her impairments, including both severe and non-severe impairments, considering all the relevant medical and other evidence in the plaintiff's case record.  After the RFC is established, step four requires the ALJ to determine whether plaintiff can perform his or her past relevant work taking into consideration the plaintiff's functional limitations. *Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). If plaintiff *cannot* perform past relevant work, the ALJ must proceed to step five.  At step five, the ALJ must determine whether the plaintiff can do any other work based on those same limitations considering the plaintiff's vocational factors (age, education, and work experience).  20 C.F.R. §§ 404.1520(g)(1).[2]   At this stage, the burden shifts to the Commissioner who must then show that there are a significant number of jobs in the national economy the plaintiff can perform considering his

---

[2]But see the exceptions to vocational factors included in 20 C.F.R. §§ 404.1520(g)(ii), that pertain to medical-vocational profiles showing an inability to make an adjustment to other work.

RFC. *Phillips*, 375 F.3d at 1237-39.  In order to support a finding that an individual is *not* disabled, the ALJ is responsible to provide evidence that demonstrates that work within the plaintiff's limitations exists in significant numbers in the regional and national economy, given plaintiff's age, education, and work experience.  20 C.F.R. § 404.1520 (c).

## IV.  ISSUES

### A.  Introduction

The plaintiff was born on February 23, 1962, and has a high school education.  After working as a waitress, she attended college from 1995 to 1997, where she received vocational training in cosmetology and an Associates Degree in accounting.  The plaintiff's prior work experience includes waitress (June, 1994 to February, 1995), hair dresser/beauty shop manager (September, 1999 to June, 2000) and beauty shop owner (June, 2002 to July, 2003) (TR 80).  There was also testimony that she performed the job of shift manager at a Taco Bell, copy clerk for Smart Corporation, mail clerk and bookstore area manager (TR 291-93).  The plaintiff last work as an attendant at her mother's kennel, (July, 2003 to January, 2004), until she had a stroke/cerebral vascular accident (CVA) on January 12, 2004.  The plaintiff's

condition was further complicated by the residuals of her stroke, new-onset seizures, diabetes, migraine headaches and sleep apnea (TR 289). Since that time, the plaintiff reports a variety of symptom/limitations that prevent her from performing her past relevant work, or any other work. She currently stays with her mother during the day, because of her various conditions, and helps her mother "[s]omewhat, a little bit, but not much" (TR 292).

### B.  Plaintiff's Claims

The plaintiff presents three issues for review: (1) whether the ALJ failed to consider the combination of plaintiff's impairments, (2) whether the ALJ improperly assessed plaintiff's residual functional capacity (RFC) and (3), whether the ALJ erred in failing to provide specific rationale for rejecting plaintiff testimony as required by Social Security Regulation 96-7p.

## III.  DISCUSSION

### A.    Plaintiff's Testimony

Plaintiff testified that the reasons she is not able to work is because she cannot stand on her feet very long (30-45 minutes), cannot lift anything heavy (more than a gallon of milk), can sit only for one hour before her legs bother her, has weakness on

6

the right side (both arms and legs), tingling in her hands (they feel like they are going to sleep), has problems sleeping and difficulty concentrating (especially with stress) (TR 294-98).  All of these problems began subsequent to her stroke in January of 2004 and new-onset seizure in October of 2004.  She takes Dilantin for seizures and sleeps with the assistance of a CPAP machine.  The plaintiff testified she still has problems not being able to "just shut off the day, and . . . it's like 12:00, 1 o'clock, 2 o'clock in the morning before [she can] lay down and go to sleep" (TR 298).  Even with the sleep machine, she still needs to take two to three naps per week.  She lays down whenever necessary (TR 299).  She cannot handle even low level stress.  Now simple chores around the house are difficult for her (TR 300).

## B.    *The Medical Testimony*

Records were obtained from Southeast Alabama Medical Center where the plaintiff was treated by Dr. Michael Obrien, M.D., and other attending physicians since January 12, 2004, subsequent to her stroke (TR 120-163).  She was admitted there a second time after having a seizure in October of 2004 (TR 177-80), and again after a second bout of seizure-like symptoms on July 18 and July 20, 2005 (TR 196-258).  There were records from Dr. E. Ross Clifton, a neurologist, who performed an EMG and nerve conduction study on January 29, 2004 (TR 164-66).  Records were provided from First Med of Dothan where the plaintiff was treated since July 31,

2002, for residuals of stroke with residual right hemiparesis,[3] persistent fatigue, seizure disorder, diabetes mellitus, migraine headaches, neck stiffness and sleep apnea (TR 173- 176c, 182-92, 260-64). Records were also provided from Southern Sleep Clinics where the plaintiff was being treated for sleep apnea by neurologist, Dr. Michael Labanowski (267-285). A disability examination was conducted by Dr. Sam Banner, D.O., on June 24, 2004.

The CVA condition was diagnosed after plaintiff's admission on January 12, 2004. It was documented by a CT of the head that was performed January 13, 2004, wherein it was found: "There is a suggestion of a low density in the region of the low left thalamic area. This possibly could represent an area of early infarction" (TR 145). This test was followed up the same day by a digital EEG with spike detection. The EEG revealed: "There are sharp waves and phase reversals in the left temporal region throughout the tracing. . .abnormal EEG on the basis of irritability in the left temporal area" (TR 148). A later CT scan of the head, done on October 25, 2004, showed "right thalamic old stroke," but with no acute abnormality (TR 177).

On admission in January of 2004, the plaintiff complained of pain across the frontal area of her head (TR 176), four hours history of right arm and leg weakness

---

[3]Muscular weakness or partial paralysis restricted to one side of the body. *Webster's Medical Desk Dictionary,* Merriman-Webster, Inc., Springfield, MA, 1986.

along with severe fatigue, bad migraine, nausea and vomiting on two episodes, slurred speech with expressive aphasia,[4] difficulty writing, poor coordination and spastic movement of her right arm; on February 4, 2004, the plaintiff complained of headache in the left occipital area extending up into the left temporal area with pain, dizziness, photophobia, sensitivity to sound and tightness in her throat (TR 174). On July 14, 2005, plaintiff reported neck stiffness over the last six weeks associated with numbness of the right leg, intermittent confusion and recurrent fatigue (TR 182). The residuals of stroke were noted in the report by the DDS examiner on June 24, 2004, as right sided weakness, speech difficulties, problems with writing tasks, severe headaches, gait imbalance and extreme fatigue with mild insomnia (TR 167). The examiner indicated that the plaintiff "will need long term medical care. She gave good effort" (TR 170). On August 29, 2005, plaintiff reported leg cramps, neck spasm, fatigue and depression (TR 260).

The symptoms of diabetes mellitus was documented by an EMG and nerve conduction study on January 29, 2004. Plaintiff was found to have "evidence of moderately severe sensory motor axonal polyneuropathy such as that seen with diabetes" (TR 166). "A polyneuropathy is a diffuse peripheral nerve disorder not

---

[4]Loss or impairment of the power to use or comprehend words usu. resulting from a brain lesion. *Webster's Medical Desk Dictionary,* Merriman-Webster, Inc., Springfield, MA, 1986.

confined to the distribution of a single nerve or single limb. . . .  Primary axon dysfunction may begin with symptoms of large- or small-fiber dysfunction or both. Usually, the resulting neuropathy has a distal symmetric, stocking-glove distribution; it evenly affects the lower extremities before the upper extremities and progresses symmetrically from distal to proximal areas." *The Merck Manual of Diagnosis and Therapy*, Merck Research Laboratories, Whitehouse Station, N.J., 2006, pp. 1904-5.; *See also*, *Peripheral Neuropathy*, Boston Medical Journal, February 23, 2002; 324:466-469.

Plaintiff's seizure activity was first diagnosed on October 26, 2004, when the plaintiff was found by a friend to be "in a fog, sleepy, unresponsive. . .not responding at all. . .just going back to sleep, and. . . in a confused state" (TR177).  At that time, Dr. Sher Ghori, M.D., diagnosed the plaintiff with a "[t]ransient, though prolonged acute diffuse cerebral dysfunction" of unclear etiology, "but differential includes possible TIA (transient ischemic attack), complex/partial seizure" (TR 179).  It was noted at that time, "[m]edications could also cause the sedation" referring to Lexapro and the Elavil (TR 179).  On July 22, 2005, plaintiff was admitted for "what appeared to be possible new onset seizures," lightheadedness, hearing loss and ringing in the ear (TR 199).  At that time, she had lost consciousness, was confused, lost power in both arms and legs, had speech difficulties, visual disturbances and was shaking all

over (TR 202, 276).  In the discussion of her condition on July 20, 2005, it was noted: "She is already on Topimax 100 mg bid and Dilantin was started and they are subtherapeutic, still had an apparent seizure" (TR 278).  The plaintiff testified that while Dilantin helps, her doctor keeps telling her that her Dilantin[5] level is not high enough, and he continues to increase the dose (TR 297).  On plaintiff's last visit to Dr. Obrien on August 14, 2005, he increased the plaintiff's Dilantin levels to 300 mg (TR 263).  One of the side effects is drowsiness (TR 224).

Plaintiff was first diagnosed with "mild" sleep apnea on August 2, 2005 (TR 274).  The sleep apnea screen was performed in connection with an admission for seizure.  Dr. Michael Labanoski, a sleep disorder specialist and neurologist, indicated that he performed a sleep apnea screen due to her complaints of excessive sleepiness, sleep apnea risks for stroke, exacerbation of migraine headaches and because of the risk that lack of sleep can lower the seizure threshold in seizure patients" (TR 278).  On August 11, 2005, approximately two months before hearing, the plaintiff's condition was noted as "moderate" in severity and Dr. Labanowski recommended an ENT evaluation and possible surgery (TR 280).

---

[5]Side effects of Dilantin are noted in the record as wobbly gait, poor balance, slurred speech, jerky eye movement, unexpected drowsiness; allergic reaction includes trouble swallowing or breathing; also taken with food to avoid stomach upset (TR 224).  On July 21, 2005, the plaintiff was noted to have dizziness, blurred vision, confusion, loss of balance, numbness all over, trouble breathing, abdominal pain and nausea after being prescribed Dilantin, 100 mg. on July 18, 2005. (TR 198, 202).

*C.*     *The ALJ's Decision*

In the instant case, the ALJ found the plaintiff to have the following severe conditions: (1) post cerebrovascular accident (CVA), (2) residuals of a stroke, (3) diabetes mellitus (DM), (4) sleep apnea, and (5) seizure disorder (TR 10).  There was substantial evidence in the record, as noted above, to support the ALJ's findings that all of these conditions were "severe."    As a result, the ALJ determined that the plaintiff was unable to perform her past relevant work:

> The plaintiff has past relevant work as a retail manager (light/skilled), a beauty shop owner and manager (sedentary skilled), and a cosmetologist (sedentary/skilled).  The biggest problem the plaintiff has is she cannot remain on her feet very long.  The plaintiff requires a sit/stand option at will; is limited to simple job instructions and low stress occupations (sleep apnea and residuals of stroke); must avoid heights and hazards (seizures, sleep apnea, and mild hearing loss); should  not work in isolation (seizure disorder); cannot perform tasks that require her to balance (more so than the balancing required to walk) e.g. balancing a tray, walking on a beam; can only occasionally climb, stoop, crouch, kneel, or crawl; cannot climb ladders, ropes, or scaffolds; and must avoid a cold environment (because she is on blood thinner and extra-sensitive to cold) (TR 12).

The ALJ further stated that:   "[s]he [the plaintiff] is easily stressed and her mind does not stay clear when she is under stress.  She can only stand or walk 30-45 minutes and her legs bother her if she sits too long.  She can sit about one hour.  The stroke affected her right side – her hands tingle.  She began having seizures.  She

takes Dilantin, which helps.  She was diagnosed with sleep apnea.  The plaintiff goes to her mother's daily while her husband works.  He does not want her to stay at home alone" (TR 12).

The ALJ recognized the plaintiff's well-documented limitations, essentially adopts most of her testimony as this was the basis for the ALJ's further limitations in the RFC assessment (See, TR 296-300, compare TR 12-13).  The ALJ found that, considering the evidence of record, that the plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms for which the plaintiff complained (TR 12).  The ALJ further stated:

> However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.
>
> The claimant was credible only to the extent medical records support her.
>
> The claimant said her treating doctor would not write anything on her behalf when the undersigned asked if he would provide an RFC.
>
> Based on the testimony and medical evidence the undersigned finds that the claimant is limited to the performance of sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  (TR 13)

The plaintiff argues that the ALJ failed to provide specific rationale for rejecting the plaintiff's testimony, as required by SSR 96-7p.   This court agrees. Particularly, the ALJ did not give any articulated reasons for failing to take into account the plaintiff's testimony that she still has trouble sleeping, needs to take two to three naps per week and needs to lay down when necessary during the day (TR 298-300).  When a hypothetical was posed to the V.E., taking these further limitations into consideration, the V.E. found that there would not be any jobs in the regional or national economy that the plaintiff could perform (TR 304).  Therefore, plaintiff's testimony in regard to her need to lie down and rest was essential to the determination of disability, and as a result, needed to be specifically addressed by the ALJ as to why she did not adopt it.  *Walker*, 826 F.2d at 1004; citing *Jones v. HHS*, 941 F.2d 1529, 1532 (11th Cir. 1991) (holding that articulated reasons must be based on substantial evidence).

Where an ALJ decides not to credit a plaintiff's subjective testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See *Foote*, 67 F.3d at 1561-62; citing *Tieniber*, 720 F.2d at 1255.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th

14

Cir. 1986).

     In this regard, SSR 96-7p provides, in pertinent part:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2;[6] *see also* 20 C.F.R. § 416.929.

     Without an adequate explanation, neither the plaintiff nor subsequent reviewers will have a fair sense of how the plaintiff's testimony was weighed.   "Where an agency's decision concerns specific persons based upon determination of particular facts and the application of general principles to those facts, courts . . . 'demand that the decisionmaker's opinion indicate an appropriate consideration of the evidence and

---

[6]Social Security Rulings are published "under the authority of the Commissioner of Social Security.  They are binding on all components of the Social Security Administration.  These rulings represent precedent final opinions and orders and statements of policy and interpretations that [the agency has] adopted."  20 C.F.R. § 402.35(b)(1); *Sullivan v. Zebley,* 493 U.S. 521, 531 n. 9 (1990).  While the agency's ruling does not bind this Court, it is accorded great respect and deference where the statute is not clear and the legislative history offers no guidance.  *B. B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981), citing *Seagraves v. Harris*, 629 F.2d 385, 390-91 (5th Cir. 1980).  The Eleventh Circuit, in the en banc decision of *Bonner v City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

arguments presented.'" *Tieniber*, 720 F.2d at 1255.  In other words, the ALJ is required to articulate the reasons for crediting and/or discrediting  the plaintiff's testimony, and give reasons for the weight accorded the testimony, so as to effectuate meaningful judicial review.

In the instant case, the ALJ indicated, "claimant was credible only to the extent medical records support her" (TR 13).  This assessment fails to articulate clearly the reasons for discrediting the plaintiff's testimony.  Indeed, the ALJ's statement of the plaintiff's  credibility is conclusory and is not linked to specific medical evidence. See *Smith ex rel E.S.D. v. Barnhart*, 157 Fed. Appx. 57, 62 (10th Cir. 2005) (concluding that the same credibility assessment "is the type of 'standard boilerplate language' that renders meaningful review impossible"); *Shafer v. Barnhart*, 120 Fed. Appx. 688, 698 (9th Cir. 2005) (holding that the ALJ's similar-stated credibility assessment was sparse, as it did not identify which portions of the testimony were credited and not credited); *Jefferson v. Barnhart*, 356 F. Supp. 2d 663, 679 (S. D. Tex. 2004) (remanding the same credibility assessment of the ALJ for failure to specifically state a credibility determination and to provide an analysis of that determination).

The fact that the treating physician would not write "anything on her [plaintiff's] behalf" (TR 13) is not a sufficient basis for the ALJ to find the plaintiff

not credible.  All that is indicated by the *in*action of the doctor is that the doctor was not cooperative with the plaintiff.  A negative cannot prove a positive.  In other words, an absence of any statement to the contrary does not weigh against all of the treating medical documentation of plaintiff's myriad of symptoms that are contained in the treating records that were provided at the hearing level.

The only evidence that the ALJ cites to in her assessment of the plaintiff's limitations is the medical examination of Dr. Banner performed on June 24, 2004 (See TR 11).  The ALJ stated as to this report: "the claimant reported a continued gait imbalance, extreme fatigue with mild insomnia, and recent diagnosis of DM.  A neurological examination[7] revealed no atrophy of any muscle group in the upper or lower extremities and muscle tone was normal" (TR 11).  Of course, after this examination, the plaintiff had one, possibly two, documented seizures (in October, 2004 and July, 2005); she was thereafter started on Topimax for sensory motor axonal neuropathy and was treated for associated numbness in both arms, and slight weakness/ numbness of the right leg (TR 11).  Dr. Banner concluded that "[p]atient will need long term medical care" and made no assessment of the plaintiff RFC.  The subsequent treatment, in addition to the newly developed condition of seizures, bears

---

[7]This clinical evaluation did not take into consideration the objective EMG/nerve conduction study perfored on January 29, 2004.  It appears that the ALJ also did not take this test, and its findings, into consideration when evaluating claimant's neurological condition under the listings.  See, *infra*, p. 19.

out Dr. Banner's prediction as correct.  Thus, the court finds that Dr. Banner's report is not substantial evidence for the failure to credit plaintiff's testimony, nor is it a basis for the ALJ's RFC determination or her conclusion that the plaintiff can perform sedentary work.  The ALJ's vague assessment is devoid of any analysis that would enable meaningful judicial review.

Plaintiff's treating physician, Dr. Labanowski, indicated that plaintiff is 50% less sleepy as of August 29, 2005, after treatment (TR 273), and this is consistent with plaintiff's testimony that she only had to take naps two to three times per week, instead of every day, as reported before (TR 298).  The ALJ accepted plaintiff's testimony that plaintiff can only stand/walk for 30-45 minutes before having to sit down, had difficulty sitting for long periods, has right side affectation in her arm and leg, tingling her hand for which she is taking Dilantin, is affected by stress, and has trouble concentrating (TR 12-13).  All of this models, almost verbatim, plaintiff's testimony at hearing (TR 296-300), and is supported by extensive medical documentation.  The ALJ does not explain why she credits some of plaintiff's limitations, and not others, when all of the plaintiff's testimony including her fatigue and sleep apnea is supported by the record.  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62; *Cannon v. Bowen*, 858

18

F.2d 1541, 1545 (11th Cir. 1988).   Thus, the testimony that the plaintiff has to lie down and take naps must be accepted as true when the ALJ reconsiders the plaintiff's RFC.

The ALJ determination as to credibility is due to be reversed on this ground. Reconsideration must take into account the additional limitations, noted above, when determining the plaintiff's RFC.

This court also questions whether the ALJ considered all of the plaintiff's impairments prior to determining RFC.[8]   "Where a 'claimant has alleged a multitude of impairments, a claim . . . may lie even though none of the impairments, considered individually, is disabling.'" *Walker,* 826 F.2d at 785, *citing Bowen v Heckler,* 748 F.2d 629, 635 (11th Cir. 1984).   It is the duty of the ALJ "to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Id.* ; 20 C.F.R. § 416.923.   It is not clear from the ALJ's decision whether she considered the combination of the plaintiff's conditions, at step 3, before determining her residual functional capacity.   The ALJ made specific reference only to the plaintiff's "sleep-related breathing disorder under Listing 3.09 (chronic core pulmonale) or 12.02

_____

[8]Plaintiff's argument 1 (Doc. #13, p. 12).

19

(organic mental disorder)," with no specific analysis under these sections, her ischemic heart disease (it does not appear from the record the plaintiff has this condition), "diabetes" under Listing 9.08 (the ALJ only quoted to the Listing, but does not analyze the decreased motor function and neurological symptoms described in the treating records), and "seizure disorder," under Listings 11.02 or 11.03, but does not consider Listing 11.04 (which addresses central nervous system vascular accident (CVA)).[9]

The ALJ made a blanket statement that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulation No. 4" (TR 11). The Commissioner argues that this is sufficient (Doc. #13, p. 5), but the ALJ did not provide analysis of the listings against the established impairments prior to the

---

[9]If the claimant experiences one or the following three month post-vascular accident, the claimant meets the listing: "(A) Sensory or motor aphasia resulting in ineffective speech or communication; or (B) Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 20 C.F.R. 404, Subpart P. Appendix 1, § 11.04A, B.

These section refer to 11.00C which gives further explanation as to what constitutes significant and persistent disorganization of motor function under this section. It describes symptoms consistent with the symptoms the magistrate recognized in the instant case: "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and *sensory disturbances* (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or *peripheral nerve dysfunction*) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms." 20 C.F.R. 404, Subpart P. Appendix 1, § 11.00C, (*Emphasis supplied)*.

determination of plaintiff's RFC.  Later in the decision, at step 5, the ALJ gives further analysis, but this court is not convinced that the ALJ conducted an analysis of the combination of impairments as is required throughout the entire evaluation process.

In  *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993), the court indicated: "Although the regulations do not provide that an ALJ must consider the combined effects of a claimant's impairments when determining whether the claimant meets a listed impairment, the regulations do require that an ALJ consider the combined effects of impairments when deciding whether impairment(s) 'equal' a listed impairment.  See 20 C.F.R. § 404.1526(a), 416.926(a)." See also *Swindle v. Sullivan,* 914 F.2d 222, 226 (11th Cir.1990); *Walker,* 826 F.2d at 1001.  The court went on to explain, "sections 404.1526(a) and 416.926(a) [require] that an ALJ consider the combination of impairments during a determination of medical equivalence [and this] imposes an *absolute duty* on the ALJ to consider the combined effects of a claimant's impairments, at least once, before concluding an evaluation under the Listing of Impairments."  *Davis v. Shalala*, 985 F.2d at 533 (*Emphasis supplied)*.  In other words, the ALJ must consider the combined affect of all of plaintiff's alleged impairment before determining the plaintiff RFC.

The ALJ's decision is due to be reversed on this ground as well.

## IV.  CONCLUSION

Based on the foregoing analysis, the court concludes that the decision of the Commissioner is due to be REVERSED, and the case REMANDED for further findings consistent with this opinion.  A separate order will issue.

DONE this 9th day of May, 2007.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE